UNITED STATES v. SHRYOCK et al.

(Circuit Court, S. D. Ohio, E. D. June 25, 1908.)

No. 62.

WATERS AND WATER COURSES—LEASE OF WATER POWER—CONSTRUCTION.

Pursuant to Act Aug. 11, 1888, c. 860, 25 Stat. 417, authorizing the same, the Secretary of War executed a lease granting to defendant the right for 20 years to use the surplus water not required for navigation at dam No. 9 on the Muskingum river for the purpose of operating an electric power plant, not exceeding 6,000 feet per minute. to be taken from the overflow canal and returned thereto. The lease and specifications attached provided that the quantity used should be determined from the tables prepared by the manufacturer of the wheels used or in the absence of such tables by the engineer in charge, the lessee to pay rent for the quantity asked for until the wheels were in place; also, that the water in the pool should not be lowered below a certain stage, but, in case of shortage, the leases first granted should have the preference and a rebate allowed for water required and not furnished. Held, that the lease contemplated the use of the water for operating a power plant only, and the govern-

ment was not obliged to furnish it for any other purpose; that, until a plant was installed, it might properly refuse to furnish water demanded for any other purpose or to go to waste, to the possible detriment of subsequent lessees; and that such refusal did not relieve defendant from the obligation to pay rent for the 6,000 feet named in the lease, which, and not the quantity so demanded, was the quantity "asked for" within the meaning of the lease.

## At Law.

This action was brought on a bond given by Shryock as principal and his codefendants as sureties to secure the payment of rents accruing on a lease for the right to use water from the water power of the Muskingum river. A verdict having been returned against the defendants, a motion is made to set it aside and for a new trial. The point of insistence is that the court, in charging the jury and in its rulings on the admissibility of evidence, erred in its construction of the lease.

On August 11, 1888, Congress enacted a law (25 Stat. 417, c. 860) which provides: "The Secretary of War is hereby authorized and empowered to grant leases or licenses for the use of the water powers on the Muskingum river at such rate and on such conditions and for such periods of time as may seem to him just, equitable, and expedient: Provided, that the leases or licenses shall be limited to the use of the surplus water not required for navigation." In pursuance of the authority vested in him by such act, the Secretary of War on August 1, 1903, invited sealed proposals for leasing, for power purposes, the surplus water not required for navigation at dam 9 in the Muskingum river. To the printed forms of proposal supplied to each bidder were attached specifications for his guidance. The specifications, among other things, recite that their purpose is to provide for leasing for power purposes the water not required for navigation, and that, where there are available lands belonging to the United States, leases will include suitable sites for the purpose of power plants, but no lands leased shall be occupied for other purposes than power plants and appurtenances. The United States reserved to itself the right to grant leases at different localities separately to different bidders, or all to the same bidder, as might be most advantageous to it, and stipulated that every lease shall be granted subject to any existing leases theretofore granted at the same locality, and that no right would be granted under any lease, subsequent to existing leases, to the use of water when the depth on the established crest of the dam is less than .2 of a foot. The quantities of water given on the blanks furnished bidders are approximated only, and bidders were told that they were expected to examine the maps and drawings in the office of the government's engineer, to visit the locality of the dam, and make their own estimates of the facilities and difficulties attending the use of water power created by it and all other contingencies, and it was specified that, in case the lessee should be deprived of the use of water by reason of its falling below a stage of .2 of a foot above the established crest of the dam, he shall be entitled to a rebate from his annual rental in a certain prescribed ratio, and that, if the water supply be insufficient to furnish the authorized allowance to all consumers, preference shall be given in the order of date of the original lease. The surplus water available at dam 9 was estimated at 11.3 feet, but the variation from time to time in the heighth of water in the pool formed by the dam is considerable. The specifications further provide as follows:

"(27) The lessee will be required to construct, maintain, and operate, on plans approved by the department, all inlet and outlet canals and other structures needed for diversion of water leased, and no structures shall be built and no operations be conducted which shall in any manner injure navigation, interfere with the operations of the government, or impair the usefulness of any improvement made by the government for the benefit of navigation. * * *

"(29) The consumption of water granted under a lease shall be determined from the tables prepared by the manufacturers of the wheels in use by the lessee, the head being assumed to be that at low water. Until the wheels are in place and the exact amount of water consumed can be determined, payment shall be made on the quantity of water asked for. Should wheels whose stand-

ard consumption has not been determined by the manufacturers be used the consumption shall be determined by the engineer officer in charge."

The lease is for a term of 20 years, commencing on May 1, 1904. The rent is made payable semiannually on the 1st days of May and November, respectively, of each year during said term. The lessee was within 60 days from the expiration of his lease to remove all buildings and machinery erected and installed by him. The specifications recite that they are to be attached, and they were in fact attached to and made a part of the lease, a copy of which was submitted for the bidder's inspection. William H. Frazier, having bid, on a blank proposal furnished him, for water power for the purpose of running an electric power plant, a lease executed, as it recites, in pursuance of the provisions of the act of August 11, 1888, and making the specifications a part of itself, was awarded him for the right to use for such purpose 6,000 cubic feet of water per minute from the water power of such river. Frazier, with the consent of the United States, assigned his lease to Shryock, who gave bond with his codefendants as bondsmen.

When the lease was offered in evidence, only portions of it were read, and its true import was not fully comprehended. In consequence, no objection having been interposed thereto, the evidence was permitted to take a needlessly wide range. The surplus water from the pool formed by the dam escaped through gates into the canal, which runs substantially parallel to the river, and empties into it at a lower point. Shryock paid four semiannual installments of rent on his lease, and then refused further payment, because, so he claims, no water had been furnished him, although he had frequently demanded it. There is some conflict in the evidence on this point, but the making of such demand is fairly established. He offered evidence to show that the canal, through freshets, especially that of March, 1907, had become out of repair, and that in some places mud and débris had become so deposited and in others the banks had been so washed away that the canal would not and could not carry the quantity of water called for by his lease, or sufficient for such a plant as he contemplated erecting, and that the United States had not furnished him any water whatever, nor had it at any time been able or willing to perform its part of the contract. The government's witnesses testified that the mud and débris lodged did not affect that portion of the canal which conveyed water to the site of his proposed plant, and that, in any event, at any time. on from 12 to 14 hours' notice, the United States could have furnished all the water called for by his lease, and that it could and would always have been ready, willing, and able to perform its contract. It was conceded that Shryock did not construct or attempt to construct a power plant, or inlets to or outlets from it. He testified, however, that he acquired a franchise from a neighboring town, had a "tentative" contract with a railroad company to furnish its engines with water, leased from the government a site on the canal for a power plant, for which he paid the rent, engaged one engineer whom he paid $100, and a subsequent engineer who advised him not to build until the water was furnished. The reason assigned by Shryock for not building was that there was not sufficient water in the pool to supply his demand, but there is no evidence that he so notified the United States or sought a cancellation of his lease. The insufficiency of water supply was controverted by the government's engineer in charge, who made four measurements per day as to the stage of water in the pool.

Sherman T. McPherson and Edward Moulinier, for the United States.

Kennedy & Mackey, for defendants.

SATER, District Judge (after stating the facts as above). By the terms of Act Cong. Aug. 11, 1888, c. 860, 25 Stat. 417, under which the lease was executed, the surplus water not required for navigation could be leased for power purposes only. The purpose of the act is the creation of revenue for the government and the encouragement of enterprises calling for the use of water as a means of power. The

bidder was notified by the specifications, which he in his proposal states he understood, that the leasing was to be for power purposes only, and the lease expressly states that the water was to be used for running an electric power plant. It contemplates the construction, maintenance, and operation by the lessee of a power plant, with inlets to conduct to it water from the canal, and outlets for the flow of water to the river after it had performed its office in generating power. After the wheels were installed in his plant, the quantity of water used was to be determined from the tables prepared by the manufacturers of the wheels, or, in the absence of such wheels, by the engineer officer in charge, and, until the wheels were so installed so that the amount of water consumed could be determined, payment was to be made on the quantity of water asked for. The quantity of water asked for is the quantity named in the lease—6,000 cubic feet per minute. Were this not so, the lessee by making no request for water would be wholly relieved from the payment of rent, and not only would the purpose of the law be thus defeated, but the express provision of the lease that rent should be paid on the 1st day of May and the 1st day of November of each year of the 20-year term would be nullified. He could rightfully demand water for one purpose only, and that was the production of power. Inasmuch as he did not equip himself to so use it, whatever demand he may have made for water the United States could safely ignore. He did not put it in default in the performance of its contract, because he did not perform the condition precedent to his right to make a lawful demand.

Shryock claims that he had the right to demand water, if he chose, merely for the purpose of letting it flow continuously through the canal, producing no power and serving no useful purpose, and that, if his demand so made was not granted, he was wholly relieved from the payment of rent. If his contention be correct, one person, by procuring all the leases for the surplus water available at any given pool formed by a dam, merely by remaining inactive, constructing no power plant and demanding no water, would obtain a monopoly of all the water stored, and, notwithstanding the absolute requirement as to semiannual payments of rent during each year of the term, would escape payment of all rental called for by his leases, and not only would the government thus secure no revenue, but the lessee, without cost to himself and at the expense of the government, could easily throttle competition with any plant operated by him at some other point along the river, or in the vicinity; or, by paying for the water turned into the canal at his request, without utilizing any part of it for power purposes, he could, in an inexpensive way, debar competition, and thus defeat the purpose of the government to encourage manufacturing. If a lessee should procure one or more of the earlier leases of water from a given pool, and if the government is required on his demand to supply the water called for by his lease, regardless of its use for power purposes, he might, by paying therefor, permit the water to waste by flowing down the channel of the canal to the stoppage or impairment of the business of subsequent lessees, whenever the water so wasted reduces the depth on the established crest of dam to less than .2 of a foot, and thus partially at least defeat the purpose of the

act. Shryock acquired by his lease no right to the flow of water through the canal for any other than power purposes. If he failed to equip himself to use it for such purposes, he nevertheless was obligated to pay the rent named in the lease. By the acceptance of his lease he represented himself to be about to erect and equip a power plant. For the privilege of a water right for power purposes he agreed to pay a fixed sum semiannually until his plant was installed, and thereafter such a sum as represented the value of the water furnished to him under his lease for the operation of his plant.

The representation by the United States of the depth and quantity of water stored was but an approximation, and of this he had notice. It did not guarantee him a fixed supply. If he did not construct and equip a power plant, because he believed the United States could not supply the water called for by his lease, he rested on an opinion given by an unnamed engineer of unshown experience, which he did not verify by actual test or communicate to the lessor. He did not ask for a cancellation or modification of his lease, nor did he state when his belief in the insufficiency of the water supply arose, whether within the period for which the recovery of rent is sought, or some prior period for which he had paid, nor did he attempt to reconcile his repeated demands for water with his stated belief that the supply of water would not meet the requirements of his lease. He asked for water after the flood of 1907, near the close of the period for which a recovery of rental is sought, and at a time when the government was giving him a rebate—was making no charge—on account of the injury to the canal banks occasioned by the flood. He paid without dissent, so far as the record discloses, the rents that accrued for his factory site, and yet his leases for it would have been as valueless as that for water, if the water supply was insufficient to operate his plant. The construction put upon the lease in the charge to the jury is the same as that above expressed. A view more liberal to the defense characterized the rulings in the introduction of evidence.

Motion overruled, and judgment for plaintiff on the verdict.